GEORGE W. MEAD, APPELLANT, v. MARY E. JENKINS AND
OTHERS, RESPONDENTS.

*Estoppel — when a party is not estopped by a statement of the amount due to him
made in a decree entered upon a final accounting by executors.*

One Jenkins died March 19, 1871, indebted to one Mead upon a promissory note
for $1,000, dated February 11, 1871, and payable on demand. Upon a final
accounting had by the administrator of Jenkins, upon the return of citations
duly issued, he filed an account in which Mead's claim for $1,000 and interest
was distinctly recognized as valid; but which stated that "he (Mead) had
some collateral security and has consequently compromised as to his demand
against the personal estate at $500, reserving his right to go against the real
estate, if his collateral security should fail to pay his demand in full." A
decree of the surrogate was entered settling and allowing the accounts as pre-
sented. He adjudged that the claims (stating Mead's at $500) amounted to
$1,421.92 and the assets to $995.36, and directed a *pro rata* distribution of the
latter.

Pursuant to this decree Mead received $355 on account of his $500 adjudged
to be due him, and gave a receipt therefor "for my distributive share of
my claim against said estate as decreed by the surrogate's decree." The
collateral failed to realize enough to pay the amount due to Mead, leaving
$1,139.06 still unpaid.

*Held*, that neither the decree of the surrogate nor the receipt given by Mead
estopped him from resorting to the real estate of the deceased for the collection
of the whole amount still remaining due to him.

APPEAL from part of an order or final decree of the surrogate of
Westchester county, directing the sale of certain lands belonging
to the estate of John P. Jenkins, deceased, for the payment of
debt, but further fixing the amount due to the appellant at $145,
and directing that in case that amount was deposited further pro-
ceedings should be stayed on payment of the expense of the
proceedings, such latter portion of the decree being the portion
appealed from.

*Sewall Sergeant*, for the appellant.

*M. L. Cobb*, for the respondents.

PRATT, J.:

My conclusion is that the judgment or final order in this special
proceeding should be reversed. The appeal papers present a long
and complicated story, but the material facts are few and simple in
view of the decisions upon former appeals.

The appellant is the petitioner in a special proceeding by a creditor before the surrogate of Westchester, to sell a decedent's real estate to pay debts. It seems that John P. Jenkins, the intestate, made and delivered his promissory note to the order of George W. Mead, the petitioner, dated February 11, 1871, payable on demand for $1,000, and died on the nineteenth of the following March. On the fourteenth of the next April, letters of administration were issued to Mary E. Jenkins, the widow, and Stephen M. Sherwood, who finally became the sole acting administrator. On the 24th of September, 1877, Sherwood made application for his final accounting. A citation was duly issued, returnable October 17, 1877, and was returned duly served, so that all interested persons were then legally if not actually before the surrogate. In the meantime and in February, 1877, Mead had sued the administrators and that action was still pending on the return day of the citation. The administrator filed his accounts on the 19th of October, 1877, in which Mead's claim for $1,000 and interest, is distinctly recognized as valid; but the account also states that "he (Mead) has some collateral security and has consequently compromised as to his demand against the personal estate at $500, *reserving his right to go against the real estate if his collateral security should fail to pay his demand in full*," and this sum ($500) was extended in the schedule as the amount of Mead's claim. On the same day the surrogate made and entered a final decree settling and *allowing* these accounts *as presented*. It contains no intimation of any objection by anybody. He there adjudged that the total net assets applicable to the payment of debts were $995.36, and that "the following named claims," which amounted to $1,421.92, including Mead's at but $500, "have been proved, admitted and allowed against the estate," and he thereupon directed the distribution of this $995.36 among those claimants and that Mead should be paid $355 for his *pro rata* share which, on that basis, left but $145 out of this $500 unpaid. Afterwards and on the 26th of October, 1877, while Mead's suit was still pending, the administrators paid him this $355, and he gave them a receipt for that amount "for my distributive share of my claim against said estate *as decreed by the surrogate's decree*."

The main question arises just here: The widow and heirs-at-law

now claim that Mead is barred and estopped by this decree and receipt from asserting any claim against the real estate except for this $145 balance, and the surrogate has adopted that view, and directed a sale of certain real estate unless the heirs, etc., shall pay the $145, etc., into court for Mead's benefit. He proved that he had exhausted his collateral and obtained but little or nothing, and showed that he had entered judgment against the administrators in his said action for some $1,494.06, which sum less the $355 is $1,139.06 he claims as his unsatisfied debt.

It is obvious at the outset that the intestate was hopelessly insolvent so far as personal estate extended, and, therefore, two plain results would seem to follow: First. That but for the effect of this decree, Mead was entitled to go against the real estate with the other creditors, for the whole balance of his real claim. The arrangement stated in the account did the other creditors no possible harm — indeed, it benefitted them — because they thereby immediately received a larger dividend from the personal estate than they otherwise would have received, and their *pro rata* from the real estate would be correspondingly reduced. Second. It did the widow, heirs-at-law and next of kin no possible harm, because they could get nothing from the personal estate in any event, and the real estate stood in equity bound to pay the balance of the decedent's debts. It is, therefore, apparent that the whole effect of this arrangement was to change merely the *ratio* in which the creditors should *rank* against the real and personal estate of their debtor, *without affecting the pecuniary rights of these respondents in the slightest degree.* It is equally plain, at the same time, that *the real intention of Mead and these administrators* was to permit and accomplish precisely that result by a frank open statement on the face of the record, where all interested persons might see and object to it if it was not equitable and just, or if there was anything technically wrong about it, and the fact is that nobody objected, and the surrogate approved and *allowed* this account just as it was presented.

Under these circumstances it will require very plain reasoning to induce me to frustrate the plain and honest design of these people which was so evidently made in good faith, and permit this widow and these heirs-at-law and next of kin to profit at Mead's expense

to the extent of $1,139.06 by such a *bloodless technicality*, which has not even a shadow of equity for its foundation.

We then come to consider the force and effect of this decree. Ordinarily of course, the personal estate is the primary fund for the payment of debts, and all persons interested in that fund must come and assert their rights with respect to it on the accounting. So, also, there is much force in the position that where there are no explanatory circumstances the decree indicates who the creditors are and the amount of their respective claims. But that is not this case. There was some collateral, the nature of which did not appear. Whether it was decedent's property or somebody's else, we do not know. Presumptively it was not of the decedent's estate, otherwise some notice would have been taken of the possible equity in it by the administrators in their schedule of assets. If it was not a part of decedent's estate the arrangement with the administrator was plainly for the advantage of these respondents ; and if it was, it was quite immaterial to their ultimate pecuniary rights whatever the motive was for this arrangement. It is plain that there was nothing unfair or illegal about it, nothing which a court of equity *could* not and would not ratify and approve. It seems to me that this is precisely what the surrogate did lawfully and properly so. He doubtless possessed the power to do it for he sits as a court of equity upon these matters of account, and possesses all the powers which the chancellor formerly had or which this court has, upon like subject matter. Here then we have an account which stands somewhat in the nature of a pleading — followed by a judgment. That pleading does not state that this claim has been absolutely compromised at $500. Indeed it has not been compromised at all in the proper sense of that term. A bargain has been made in respect to it, the plain effect of which was to recognize the validity of the whole claim, to secure forbearance for a time with respect to a part of it, to give the personal estate the benefit of immediately applying the money in hand in payment of debts, and thus stopping interest *pro tanto*, and the chance which might result from the proposed experiment with the collateral, *but to hold the decedent's property nevertheless*, until the whole debt was paid in full. I quite fail to see how these respondents by their failure to object, or the surrogate by his *allowance* of these accounts, could split this obviously fair arrangement in two,

taking and ratifying that which made for the respondents, however inequitably, and rejecting and repudiating that which was scant justice to this petitioner. The decree was taken *pro confesso* upon this antecedent record which stood in the nature of a pleading, and when the surrogate " allowed " this account he acted upon respondents *implied assent* and allowed it *in toto.* Hence if this view be correct the estoppel applies in Mead's favor and not to his prejudice, and this is the manifest common sense and justice of the case. To hold the contrary would be to elevate the mere name "real estate" of a decedent to a higher and more sacred position than the rights of parties in it.

Nor can I see anything in the suggestion that there were infant parties to be affected by this arrangement. The answer is two-fold: In the first place *they were not injuriously affected by it.* On the contrary, there were possible prospective benefits in it. In the next place, they were legally represented before the surrogate who was clothed with power to do what seemed to him to be equity in the premises, and he did it, and in my judgment did it wisely and for their advantage.

I find no difficulty with the receipt in this view. It was the acceptance of the decree, which as we have seen, was a judicial ratification of the arrangement.

A question has been raised respecting the quantity of real estate to be sold. We do not see from this case how we can determine this question. It may have been supposed that the lands which the learned surrogate ordered sold were by him deemed sufficient to pay the small claim of $145, etc., to which he found the petitioner entitled, and perhaps he might determine that it would be necessary to sell more in order to meet the claim as we see it. It is sufficient that we do not think that the court, upon any previous appeal, has finally decided the rights of the petitioner in that regard as against the holders of that real estate. We therefore direct that the final order or decree of the surrogate shall be reversed, with costs and disbursements to the appellant, leaving the surrogate to make such order in the premises with respect to the amount of property to be sold and the time and conditions with respect to payment of petitioners claim as to him shall seem just.

BARNARD, P. J., concurred; DYKMAN, J., dissented.

Decree of surrogate reversed, with costs to appellant, leaving to the surrogate to make such order with respect to the amount of property to be sold and the times and conditions with respect to payment of petitioner's claim as shall be just.